IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES GOVERNMENT FOR
THE USE AND BENEFIT OF
MARYLAND MINERALS AND
CRANESVILLE STONE COMPANY, INC.,

     Plaintiff,

v.                                                       Civil Action No. 2:03CV92
                                                                 (STAMP)

UNITED STATES FIDELITY AND
GUARANTY COMPANY and
KIMBERLY CONCRETE, INC.,

     Defendants,

and

UNITED STATES GOVERNMENT FOR THE
USE AND BENEFIT OF ESSROC, INC.,

     Plaintiff,

v.                                                     Civil Action No. 2:03CV104
                                                                  (STAMP)

UNITED STATES FIDELITY AND
GUARANTY COMPANY and
KIMBERLY CONCRETE, INC.,

     Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.  Introduction

Maryland Minerals and Cranesville Stone Company, Inc. ("Cranesville Stone") filed this action against defendants, United States Fidelity and Guaranty Company ("USF&G") and Kimberly Concrete, Inc. ("Kimberly Concrete"). Essroc, Inc. ("Essroc") also filed a similar action against USF&G and Kimberly Concrete. These civil actions were then consolidated.

These actions against USF&G are based upon the Miller Act pursuant to 40 U.S.C. §§ 3131-3134 and against Kimberly Concrete under supplemental jurisdiction pursuant to 28 U.S.C. § 1367. On October 26 and 27, 2006, this Court conducted a two-day bench trial in this consolidated action. This action arose from defendant Kimberly Concrete's failure to pay plaintiffs, Maryland Minerals, Cranesville Stone and Essroc, for materials they supplied for use on a federal construction project managed by the general contractor, P.J. Dick, Incorporated ("P.J. Dick"). The project consisted of the construction of the federal penitentiary at Hazelton, West Virginia ("penitentiary project"). P.J. Dick was bonded by a surety bond issued by defendant, USF&G. P.J. Dick contracted with Kimberly Concrete to supply concrete products for the penitentiary project. Plaintiffs, Maryland Minerals, Cranesville Stone and Essroc, supplied raw materials to Kimberly Concrete. Before the penitentiary project's completion, Kimberly Concrete encountered financial problems, ceased production and thereby failed to pay certain sums allegedly due the plaintiffs. Plaintiffs then filed claims on the surety bond. However, USF&G asserted that Kimberly Concrete was a materialman to P.J. Dick and refused payment.

It appears to be agreed that under the Miller Act, the plaintiffs may only recover under the USF&G bond if Kimberly Concrete was P.J. Dick's subcontractor and was not a materialman or

2

supplier. Thus, it is agreed by the parties that the primary issue in this civil action is whether Kimberly Concrete was P.J. Dick's subcontractor or whether it was a materialman or supplier on the project. If the plaintiffs are entitled to recover, there are then issues as to the amount of the damages recoverable. There is also an issue as to whether or not the plaintiff's claims were timely filed and notice timely given.

Based upon this Court's review of the evidence, upon the resolution of factual disputes after giving due consideration to both the credibility of the witnesses and the various documents produced, and based upon this Court's review of the applicable law, this Court, pursuant to Federal Rule of Civil Procedure 52(a), hereby makes the following findings of fact and conclusions of law and finds that Kimberly Concrete, was a supplier or materialman and not a subcontractor to P.J. Dick. Therefore, plaintiffs are not entitled to recover on their claims under the Miller Act bond issued by USF&G and the complaints of the plaintiffs in this consolidated action must be dismissed and judgment entered for defendant, USF&G.

## II. Findings of Fact

1. Plaintiff, Essroc, successor by merger to Capitol Cement Corporation, is a Pennsylvania corporation.

2. Plaintiff, Maryland Minerals, is a Maryland corporation.

3. Plaintiff, Cranesville Stone, is a West Virginia corporation.

4. Defendant, USF&G, is a Maryland corporation.

5. Defendant, Kimberly Concrete, was a West Virginia corporation.

6. Kimberly Concrete, as a result of its bankruptcy, is no longer a party to this litigation.

7. On or about September 15, 2000, the Federal Bureau of Prisons contracted with P.J. Dick, Incorporated ("P.J. Dick") to design and build the United States Penitentiary and Federal Prison Camp located in Hazelton, West Virginia ("penitentiary project").

8. Pursuant to the Federal Bureau of Prisons' contract, P.J. Dick provided a payment bond issued by USF&G. Under this payment bond, the United States was the obligee, P.J. Dick was the principal, and USF&G was the surety. To complete construction of the penitentiary project, P.J. Dick entered into various subcontracts and purchase orders and, as well, itself performed certain portions of the work, including the concrete work which is the subject of this civil action.

9. Kimberly Concrete was the concrete fabricator for the penitentiary project.

10. Maryland Minerals supplied sand used by Kimberly Concrete for the penitentiary project.

11. Cranesville Stone supplied stone used by Kimberly Concrete for the penitentiary project.

12. Essroc, the successor to Capitol Cement Corporation, supplied cement used by Kimberly Concrete for the penitentiary project.

13. Several other entities, of course, were involved in the construction of the penitentiary project. For purposes of this civil action, Rotondo Weirich Enterprises ("Rotondo Weirich") prefabricated and installed the prison cells for the penitentiary project, Trumbull Corporation ("Trumbull") performed excavation work for the penitentiary project and Harris Masonry, Inc. ("Harris Masonry") performed masonry and architectural precast concrete work for the penitentiary project.

14. After the solicitation of various other entities, P.J. Dick selected Kimberly Concrete to provide it with ready mix concrete to meet its requirements under its contract with the Federal Bureau of Prisons.

15. P.J. Dick entered into a purchase order (Purchase Order No. 20521-103.) with Kimberly Concrete dated February 7, 2001. (Pl.'s Ex. No. 1; Def.'s Ex. No. 1.)

16. Kimberly Concrete was a local, woman-owned business. The owner was Kimberly Bolyard whose husband, Russell Bolyard, operated the company.

17. Prior to entering into the purchase order with P.J. Dick, Kimberly Concrete built a concrete batch plant in Hazelton, West Virginia on property immediately adjacent to the penitentiary project in order to be close enough to provide concrete for the penitentiary project. Also, even prior to its entering into the purchase order with P.J. Dick, Kimberly Concrete was producing and selling concrete from the Hazelton batch plant.

18. While a company known as Dennis Lumber was the low bidder on the project and more experienced than Kimberly Concrete, P.J. Dick awarded the purchase order to Kimberly Concrete because Dennis Lumber's batch plant was some nine miles away from the penitentiary project.

19. P.J. Dick used certain standard subcontract forms for its subcontractors and certain standard purchase orders for its materials suppliers. Supplementing the purchase order that P.J. Dick had with Kimberly Concrete were two change orders one dated June 1, 2001 (Def.'s Ex. No. 2.) and another dated August 1, 2001 (Def.'s Ex. No. 3.). The second change order dated August 1, 2002 (Change Order No. 2.) contained language referring to Kimberly Concrete as a "subcontractor." The first change order (Change Order No. 1.) contained no such language. In its contracts with Maryland Minerals and Cranesville Stone, Kimberly Concrete referred to itself as a "contractor." (Pl.'s Ex. Nos. 34 and 35.)

20. P.J. Dick's purchase order with Kimberly Concrete was on a unit price basis and did not obligate Kimberly Concrete to deliver the concrete on the penitentiary project at a fixed price.

21. The Kimberly Concrete purchase order from P.J. Dick did not set forth a total quantity of material to be delivered nor did it include a date on which the materials were to be delivered.

22. Further, under the purchase order, Kimberly Concrete was not guaranteed by P.J. Dick that it would be the sole provider of concrete on the penitentiary project.

23. Paragraph 9 of the purchase order provides: "All Sales taxes are included in all of the unit prices listed above."

24. The two change orders executed by P.J. Dick under the Kimberly Concrete purchase order added a different strength of ready mix concrete (5000 psi) at a fixed price per unit, which provision was not included in the initial purchase order. Kimberly Concrete was not involved in the decision to add the 5000 psi concrete on the penitentiary project.

25. A representative of P.J. Dick testified that reference to the term "subcontractor" in Change Order No. 2 was a "flow down reference" from the Bureau of Prisons' contract and that P.J. Dick administratively used the language in that change order without making a distinction between suppliers or subcontractors. The P.J. Dick representative testified that the use of the word

"subcontractor" in that one document was a "clerical glitch" and that the word "supplier" should have been used instead.

26. Under its purchase order from P.J. Dick, Kimberly Concrete was required to fabricate concrete under specific requirements obtained in certain specifications. (Pl.'s Ex. Nos. 1-4; 6-11.) These specifications contained requirements for the strength, slump, constituent materials and fabrication process for each type of concrete. Each type of concrete was fabricated according to a particular mix design. Kimberly Concrete was required to perform certain tests on each submitted mix design.

27. P.J. Dick's ordering of ready mix concrete from Kimberly Concrete was generally typical of other types of pours that Kimberly Concrete had previously provided to other customers. Kimberly Concrete's compliance with the specifications is fairly typical to other public projects.

28. The six types of concrete included in the specifications were: Class D (5000 psi), Class C (4000 psi), Class B (4000 psi), Class A (3000 psi), Lean Mix (1000 psi) and Pump Mix (4000 psi). Russell Bolyard was able to utilize mix designs from a prior project for two of the six types of concrete. Mr. Bolyard had to develop the mix designs for the remaining four types of concrete. Several mix designs were later modified by Kimberly Concrete and these modified mix designs and test results were sent to P.J. Dick for its approval. Adjustments would have to be made from time to

time concerning various materials depending upon ambient temperature or moisture of sand and stone.

29. All of the concrete delivered by Kimberly Concrete to the penitentiary project was fabricated from the Hazelton batch plant. Kimberly Concrete supplied concrete for other entities other than those related to the penitentiary project from its Hazelton batch plant.

30. Under its purchase order with Rotondo Weirich, Kimberly Concrete provided normal weight concrete to Rotondo Weirich from early spring 2001 to November 2002, just before Kimberly Concrete ceased business operations.

31. The purchase order between Rotondo Weirich and Kimberly Concrete (Def.'s Ex. No. 15.) is a fixed cost purchase order, and delivery of that concrete to Rotondo Weirich occurred during the penitentiary project. Kimberly Concrete also supplied concrete to Rotondo Weirich for projects other than those related to the penitentiary project.

32. Under the Rotondo Weirich purchase orders, Kimberly Concrete used materials from the plaintiffs, Essroc, Maryland Materials and Cranesville Stone.

33. Kimberly Concrete and P.J. Dick often worked closely together during the penitentiary project regarding scheduling the concrete pours and delivery times and amounts of the fabricated concrete would often be on a daily "will call" basis.

34. Before closing for the day, Kimberly Concrete would wait for representatives of P.J. Dick to notify Kimberly Concrete that P.J. Dick required no more pours or anything else for that day, at which time Kimberly Concrete would be released for the day.

35. P.J. Dick stationed one of its employees above the Hazelton batch plant to monitor Kimberly Concrete's activities, including the amount of time necessary to load a truck.

36. A representative of P.J. Dick periodically took samples of Kimberly Concrete's product for quality control purposes when its concrete trucks arrived at the penitentiary project.

37. Russell Bolyard was occasionally called to the penitentiary project to render advice to P.J. Dick on matters related to the fabricated concrete.

38. On at least one occasion, P.J. Dick asked Kimberly Concrete if it could store its cinders on Kimberly Concrete's property and use Kimberly Concrete's loader to load the cinders. Kimberly Concrete agreed to this request.

39. Kimberly Concrete's coordination was limited to delivery of concrete to various buildings. P.J. Dick would coordinate the delivery of concrete with the masonry contractors. It was P.J. Dick's responsibility to direct the locations of the placement of all concrete.

40. During the afternoon, P.J. Dick would call Kimberly Concrete with notification of how much concrete was needed by P.J.

Dick, where it was to be delivered, and the rate of pour that P.J. Dick required.

41. While P.J. Dick had the authority to backcharge Kimberly Concrete if it was necessary to do so, there is no evidence that P.J. Dick ever backcharged Kimberly Concrete.

42. Kimberly Concrete originally had five concrete trucks on the penitentiary project but later, to supports its activities under the purchase order, Kimberly Concrete purchased eight additional trucks.

43. Plaintiffs reasonably believed that the supplied materials were being used for the penitentiary project.

44. Kimberly Concrete ceased business operations on December 5, 2002.

45. There were instances when Kimberly Concrete told P.J. Dick that it was unable to deliver ready mix concrete as requested.

46. Kimberly Concrete was never involved in the determination of the class of the concrete, the strength of concrete, the admixtures, if any, appropriate for the condition, the truck delivery locations, or the rate of the pours. These decisions were made by employees of P.J. Dick.

47. Kimberly Concrete's only on-site activity was to discharge the ready mix concrete from the truck. It had no other responsibilities with respect to the placing of the concrete.

48. If the ready mix concrete did not meet the penitentiary project's specifications, it was rejected and, as noted above, Kimberly Concrete was never backcharged for rejected concrete.

49. P.J. Dick has paid all but one invoice from Kimberly Concrete, that being one in the amount of $6,156.46. (Def.'s Ex. No. 9.)

50. Kimberly Concrete did not pay its employees Davis-Bacon Wage rates and never submitted certified payroll reports. Kimberly Concrete does not hold a West Virginia contractors license.

51. Essroc (formerly Capitol Cement) never delivered materials directly to the penitentiary project but instead the materials were delivered to the Kimberly Concrete batch plant at Hazelton.

52. Materials delivered by Essroc to Kimberly Concrete prior to September 16, 2002 have been paid for by Kimberly Concrete. None of the materials delivered by Essroc after November 13, 2002 are a part of its claim in this civil action.

53. The Hazelton batch plant was approximately three-fourths of a mile away from the Hazelton penitentiary. In order to deliver the concrete to the penitentiary project site, Kimberly Concrete's trucks did not have to travel on any public roads except for a short gravel section of a public road that had no weight restrictions. When delivering concrete to the penitentiary project, Kimberly Concrete's trucks pulled out of the Hazelton

12

batch plant onto the construction access road that went to the penitentiary project.

54. Since Kimberly Concrete did not have to travel on any public roads with weight restrictions, its trucks were able to transport nine or more yards of concrete at a time instead of only seven yards.

55. When Kimberly Concrete's truck drivers arrived at the penitentiary project site, an inspector would test the concrete slump and if the slump was not correct, Kimberly Concrete's drivers might add water or chemicals to correct any potential problem. Kimberly Concrete's drivers would then attach and direct the shoot in order to discharge the concrete to the correct location as directed by P.J. Dick. Kimberly Concrete's drivers would then adjust the speed of the drum in order to control the flow of the concrete.

56. On February 29, 2000, Maryland Minerals and Kimberly Concrete entered into a supply contract for sand.

57. Maryland Minerals's last delivery of sand to Kimberly Concrete occurred on November 26, 2002.

58. On February 29, 2000, Cranesville Stone and Kimberly Concrete entered into a supply contract with Kimberly Concrete for stone (coarse aggregate).

59. Cranesville Stone's last delivery of stone to Kimberly Concrete's batch plant at Hazelton was on November 11, 2002.

60. In early December 2002, Kimberly Concrete ceased delivering ready mix concrete to P.J. Dick at the penitentiary project.

61. P.J. Dick was able to replace Kimberly Concrete with another concrete supplier within one week.

62. Dennis Lumber, the concrete supplier that replaced Kimberly Concrete by a purchase order, then provided material on the penitentiary project until October 2003.

63. Cranesville Stone last delivered stone to Kimberly Concrete's Hazelton batch plant on November 11, 2002.

64. Essroc last delivered cement on November 4, 2002.

65. Maryland Minerals has not been paid certain sums for sand supplied to Kimberly Concrete's Hazelton batch plant.

66. Cranesville Stone has not been paid certain sums for stone supplied to Kimberly Concrete's Hazelton batch plant.

67. Essroc has not been paid certain sums for cement supplied to Kimberly Concrete's Hazelton batch plant.

68. On December 10, 2002, within 90 days of its last delivery of sand to Kimberly Concrete, Maryland Minerals wrote a letter to P.J. Dick indicating that it was requesting payment for the amounts owed to it by Kimberly Concrete. This written notice indicated that Maryland Minerals "was presenting these invoices to P.J. Dick for payment." Maryland Minerals then attached to its letter a summary of Kimberly Concrete's unpaid invoices totaling $85,986.43.

14

69. Maryland Minerals filed its complaint in this civil action on October 24, 2003, which was within one year of its last delivery of sand to Kimberly Concrete on November 26, 2002.

70. On December 10, 2002, within ninety days of its last delivery of stone to Kimberly Concrete, Cranesville Stone wrote a letter to P.J. Dick requesting payments of amounts owed to it by Kimberly Concrete. This letter stated that Cranesville Stone "was presenting these invoices to P.J. Dick for payment." Attached to that letter was an invoice in the amount of $37,294.80.

71. Cranesville Stone filed its complaint in this civil action on October 24, 2003, which was within one year of its last delivery of stone to Kimberly Concrete on November 11, 2002.

72. On February 12, 2003, within ninety days of the last delivery of cement to Kimberly Concrete, Essroc by its attorney sent P.J. Dick a letter by certified mail stating that Kimberly Concrete owed Essroc $140,955.53 for cement supplied for the penitentiary project.

73. Essroc filed its complaint in this civil action on November 25, 2003, which was within one year of its last delivery of cement to Kimberly Concrete on December 4, 2002.

74. If USF&G incurs a loss on the bond under the Miller Act, P.J. Dick will become obligated to reimburse USF&G.

75. Any finding made by this Court which is not a finding of fact shall be deemed a conclusion of law.

III. Conclusions of Law

1. As agreed upon by the parties, the principal issue in this civil action is a determination as to whether Kimberly Concrete was a supplier or a subcontractor in its relationship with P.J. Dick.

2. While the Miller Act does not define the term "subcontractor," the Supreme Court in MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 109 (1944), 64 S. Ct. 890, 894, indicated that a "subcontractor" was "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen."

The test for whether one is a subcontractor is based on the "substantiality and importance of his relationship with the prime contractor." F.D. Rich Co. v. United States for Use of Indus. Lumber Co., 417 U.S. 116, 123, 94 S. Ct. 2157, 2162 (1974). That Court indicated: "It is the substantiality of the relationship which will usually determine whether the prime contractor can protect himself, since he can easily require bond security or other protection from those few "subcontractors" with whom he has a substantial relationship in the performance of the contract." Id. at 123-24, 94 S. Ct. at 2162 (quoting MacEvoy, 322 U.S. at 110, 64 S. Ct. at 895).

16

In making the distinction between a subcontractor and a materialman, courts have applied a balancing test with certain factors tending to weigh in favor of a subcontractor relationship, particularly where the company assumed a significant and definable part of the construction project, and other factors tending to weigh in favor of a materialman relationship. <u>United States for the Use and Benefit of Conveyor Rental & Sales Co. v. Aetna Cas. & Sur. Co.</u>, 981 F.2d 448, 451 (9th Cir. 1992).

In <u>Conveyor Rental</u>, the court indicated that:

> Generally, courts have found the following factors weigh in favor of a subcontractor relationship: (1) the product supplied is custom fabricated; (2) the product supplied is a complex integrated system; (3) a close financial interrelationship exists between the companies; (4) a continuing relationship exists with the prime contractor as evidenced by the requirement of shop drawing approval by prime contractor, or the requirement that the supplier's representative be on the job site; (5) the supplier is required to perform on site; (6) there is a contract for labor in addition to materials; (7) the term "subcontractor" is used in the agreement; (8) the materials supplied do not come from existing inventory; (9) the supplier's contract constitutes a substantial portion of the prime contract; (10) the supplier is required to furnish <u>all</u> the material of a particular type; (11) the supplier is required to post performance bond; (12) there is a backcharge for cost of correcting supplier's mistakes; and (13) there is system of progressive or proportionate fee payment

<u>Conveyor Rental</u>, 981 F.2d at 451-52 (footnotes omitted).

On the other hand, the court in <u>Conveyor Rental</u> stated:

> Generally, cases have found the following factors tend to weigh in favor of a materialman relationship: (1) a purchase order form is used by the parties; (2) the materials come from preexisting inventory; (3) the item supplied is relatively simple in nature; (4) the contract

17

is a small percentage of the total construction costs;
and (5) sales tax is included in the contract price.

Conveyor Rental, 981 F.2d at 452 (footnotes omitted).

Applying the Conveyor Rental factors to the findings of fact set forth above, this Court finds that Kimberly Concrete was a materialman or supplier and not a subcontractor. Therefore, plaintiffs who are suppliers to Kimberly Concrete as a supplier may not maintain a claim on the Miller Act bond issued by the defendant, USF&G.

    3.    Plaintiffs have met the jurisdictional requirements under the Miller Act. Specifically, plaintiffs each gave proper notice of nonpayment to P.J. Dick within 90 days of their last delivery of materials. This Court believes that the notices given by Maryland Minerals and Cranesville Stone were appropriate notices of a claim and not solely offers to compromise or settle a claim, as characterized by USF&G. Essroc's notice of its Miller Act claim by certified letter dated February 12, 2003 is within the 90-day notice period after its final delivery of cement on December 4, 2002. All plaintiffs filed their complaints within one year of their last delivery.

    4.    Because this Court, based upon the above findings of fact and conclusions of law, determines that the plaintiffs are not entitled to recover under the Miller Act against defendant, USF&G, this Court need not determine what amounts, if any, the plaintiffs

would have been entitled to recover had they had viable Miller Act claims.

5. Therefore, this Court finds for the defendant United States Fidelity & Guaranty Company. As noted above, Kimberly Concrete is not a part of this civil action because it was previously discharged in bankruptcy.

6. Any conclusion by this Court which is not a conclusion of law shall be deemed a finding of fact.

Pursuant to Federal Rule of Civil Procedure 58, the clerk is DIRECTED to enter judgment for the defendant, United States Fidelity and Guaranty Company, on this matter.

It is further ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of these findings of fact and conclusion of law to counsel of record herein.

DATED: June 8, 2007

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE